[No. 10044.   Department One.   March 28, 1912.]

ALASKA BANKING & SAFE DEPOSIT COMPANY, *Respondent*, v.
D. W. SIMMONS *et al., Appellants.*[1]

PARTNERSHIP—WITHDRAWAL OF MEMBER—EVIDENCE—SUFFICIENCY.
The evidence fails to show that a member had withdrawn from a
partnership before the execution of a note to a bank, where there
was evidence that he was introduced to the bank as interested in
the firm and indorsed prior notes for the firm, subsequent to the
alleged withdrawal, that subsequently he agreed to give his services
to the firm for one year free, or furnish a man in his place, and the
firm paid no rent for a building of his which it occupied, and the
other partner denied that he ever ceased to be a member.

HUSBAND AND WIFE—COMMUNITY DEBT — ACTIONS — JUDGMENT—
FORM.   In an action against a husband on a promissory note in
which the wife was joined with a view of establishing the debt as
their community debt, a judgment against the husband alone re-
citing that it is enforceable out of the separate and community
property of the husband is not a judgment against the wife's com-
munity interest, or against the community.

Appeal from a judgment of the superior court for King
county, Tallman, J., entered May 4, 1911, upon findings in
favor of the plaintiff, in an action upon a promissory note,
after a trial to the court.   Affirmed.

*C. H. Winders*, for appellants.

*Bogle, Merritt & Bogle*, for respondent.

PARKER, J.—This is an action to recover a balance due
upon a promissory note, executed and delivered to the plain-
tiff, Alaska Banking & Safe Deposit Company, on Septem-
ber 5, 1907, by Irvine, Leslie & Co., a partnership, which
the plaintiff alleges consisted of Richard Irvine, R. G. Leslie,
and D. W. Simmons, at the time of the execution of the note.
Nellie E. Simmons, the wife of D. W. Simmons, was made a
defendant with a view to establishing the debt evidenced by
the note as a community debt of Simmons and wife, as well

[1]Reported in 122 Pac. 319.

as a separate debt of the members of the partnership. A trial before the court without a jury resulted in findings and judgment against the partnership and its members, including D. W. Simmons, for the balance due upon the note, enforcible out of the separate and community property of D. W. Simmons. Simmons and wife have appealed. The rights of the other defendants are not here involved.

The contentions of Simmons and wife are, in substance, that the trial court erred in holding (1) that Simmons was a member of the partnership at the time of the execution of the note, and (2) in adjudging that the judgment should be enforcible out of the separate and community property of D. W. Simmons. The trial court decided against Simmons upon the question of his being a member of the partnership at the time of the execution of the note, upon the ground that he was then such member in fact; and also upon the ground that he was estopped from denying that fact by reason of his act and representations inducing respondent to so believe. Findings of fact were made by the court amply supporting both of these grounds of its decision. The contentions of counsel for appellant upon this branch of the case involve almost wholly questions of fact. We will first notice the facts with a view to ascertaining whether or not the evidence warrants the conclusion that Simmons was a partner in fact. We may find that he was such, and thereby be relieved from noticing the question of estoppel.

The respondent is a banking corporation, maintaining a bank at Nome, Alaska. From the spring of 1903 until the fall of 1908, the firm of Irvine, Leslie & Company was engaged in the general merchandising business under that name, at Council City, in Alaska, which is about one hundred miles from Nome. During this period, the firm was a customer of respondent bank, both as a depositor and borrower. The firm was first organized, and a formal written copartnership agreement entered into the provisions of which, so far as we need notice them, are as follows:

"Council City, Alaska, April 1st, 1903.

"Memorandum of agreement made and entered into by and between R. Irvine, R. G. Leslie and D. W. Simmons, all of Council City, Alaska, by which the said parties agree to enter into a partnership for the purpose of conducting a general merchandise business in Council City, Alaska.

"The terms of said partnership shall exist for one year from date of agreement, unless mutually dissolved at an earlier date. The parties named herein agree to furnish sufficient capital as it may require to carry on said business, each individual shall furnish a like sum.

"The parties agree to carry on said business in the Simmons building situated between the Hub Saloon and the U. S. Marshall's office, said building being the property of D. W. Simmons party herein, and same shall be used free of rent, it being understood and agreed, that said D. W. Simmons contributes said building free of charge to himself and partners, and they agree to give their services without remuneration, in the management of said business. . . .

"R. Irvine,<br>
"D. W. Simmons,<br>
"R. G. Leslie."

Each of the partners, including Simmons, then paid into the capital stock of the firm $1,000, which is all that was ever actually contributed in money towards the capital of the firm by any of its members. In the fall of 1903, Simmons left Council City, intending to spend the winter in Seattle and elsewhere and return the following spring or summer. The partners realizing that he probably could not get back to Council City until after April 1st 1904, which would be the end of the partnership period according to the written agreement, it was agreed between the partners that the partnership should continue until his return. He returned to Council City about July 1st, 1904. He claims that soon thereafter the partnership was dissolved by mutual consent. He testifies that he could not then get his money out without crippling the business, and it was agreed between them that he should not take his money out until they suspended business, or for a period of time in any event. There is no more

definite testimony than this as to how much he was to re-
ceive for his interest in the business, or as to when he should
receive it, and it is conceded that he never received anything
for his interest.  He further testifies that it was then under-
stood that the other partners were to have the continued use
of his building for $50 per month.  He admits, however, that
none of this rent was ever paid to him.  Irvine in his testi-
mony denies that Simmons ever ceased to be a partner in
the business.  The testimony of other witnesses is conflicting
upon this question.  Their testimony consists largely of
statements of mere conclusion, and is to a considerable ex-
tent hearsay.  Such is the unsatisfactory condition of the
evidence bearing directly upon the question of Simmons with-
drawing from the partnership.  Subsequent events, however,
we think throw a great deal of light upon this question.  In
noticing these events, it will be well to keep in mind that all
of the evidence which tends to show Simmons' withdrawal
from the partnership tends to show that such withdrawal oc-
curred in the summer of 1904.  It is not claimed to have
occurred later than that, nor at any other time.  Irvine testi-
fies that Simmons "assisted in the business during the sum-
mers 1905 and 1906."  In 1905 Simmons signed a paper
reading as follows:

"Council City, Oct. 7th, 1905.

"I, the undersigned, D. W. Simmons, a member of the
firm of Irvine, Leslie & Company, do hereby agree to give
my services free from June 1st, 1906, to Oct. 1st, 1906, or
pay a man to take my place.  D. W. Simmons."

There is no direct evidence explaining the occasion of the
signing of this paper, but its purpose was evidently to show
some understanding between him and the other partners, and
in any event seems to be a plain admission that he was then
a partner.  In the fall of 1906 the firm had become indebted
to the National Grocery Company in a considerable sum.
Simmons then went to Nome, where he met a Mr. Dunbar,
a representative of that company.  They then talked over

the conditions and prospects of the firm in connection with
this indebtedness, and also the possibility of the firm procur-
ing a loan from respondent bank.   Simmons being not very
well acquainted with the officers of the bank, and Dunbar
being well acquainted with them, having had large business
dealings with them, he agreed to speak to the bank officers
in behalf of the firm with a view to the firm procuring a loan.
Soon thereafter Simmons and Dunbar went to the bank to-
gether with a view to securing a loan for the firm of $7,000.
Mr. Thatcher, the manager of the bank, testified as to what
occurred on that occasion as follows:

"In the fall of 1906 Mr. Simmons came into our bank at
Nome with Mr. Dunbar of the National Company, and re-
quested a loan of $7,000.   Mr. Dunbar made the prelimi-
nary statement.   I do not think I had ever met Mr. Simmons
before.   I knew of him.   I believe Dr. Whitehead of our bank
was acquainted with him.   Mr. Dunbar introduced him and
said that he was interested with Irvine, Leslie & Co., at
Council, Alaska, and that they wanted to borrow some money,
the bulk of which was to go to his concern, the National
Grocery Company.   He said that Mr. Simmons owned some
property around North Yakima of some considerable value;
that is, his individual responsibility outside of the assets of
the firm.   Mr. Simmons assented to all this.   Dr. White-
head and myself—it was in the presence of all of us—asked
him if he would personally endorse the note.   He said 'Yes.'
The note was made out before, however, asked Mr. Simmons
the condition of the firm of Irvine, Leslie & Company and
he outlined it, stated about what they owe, about what their
stock on hand was, and when they expected to collect money
in and be able to pay this note.   When it came to signing
the note, I says Mr. Irvine has always signed checks for
this company and we better have some permission on this,
etc.   We called up Council,—I recollect it was in our bank;
at least the answer came to our bank, and I asked Richard
Irvine, whether Mr. Simmons was authorized to sign and
to make this note, etc., and he said 'yes,' so that completed
the loan as far as getting the money for the first $7,000.
That was paid off from time to time, as the receipts of the

mercantile business came in. In the early spring up there, along about June, of 1907."

There is but little dispute as to these facts, except Simmons denies that he gave any detailed information to the bank as to the stock and finances of the firm. It seems to us that a fair inference to be drawn as to what occurred at the bank at that time, is that Simmons then admitted he was a partner in the firm. Thereafter, in the fall of 1907, Simmons again came out to Seattle and later endorsed a note for $10,000 signed by the firm and given to the National Grocery Company. So at that time Simmons had become obligated by endorsements upon the notes of the firm for $17,000. On September 5, 1907, the loan evidenced by the note sued upon in this action was made by respondent bank to the firm. At that time Simmons was not in Alaska. This loan was made to the firm at the solicitation of Irvine, who signed the firm name thereto. The relationship existing between Simmons and the other partners was apparently only of a business nature. They were not blood relations, and had been acquainted but a comparatively short time before entering into partnership. Simmons insists that what he did for the firm after 1904, of the nature we have above noticed, was prompted by his desire to see the firm successful and by the fact that it was using his building; though he admits that at no time after the alleged dissolution of the partnership in 1904 did he ever receive any rent for the use of the building.

It is beyond dispute that Simmons became a member of the partnership at the time it was originally formed in 1903. It seems equally clear that he continued to be such partner for at least some considerable time thereafter. The general rule applicable to such a condition is, that a partnership is presumed to continue until that presumption is overcome by evidence tending to show a dissolution. 30 Cyc. 418. In view of the conflict in the evidence relating directly to the alleged withdrawal of Simmons from the partnership in 1904,

and the subsequent events pointing to the service performed for, and interest manifest in the affairs of, the firm shown by evidence which is practically free from conflict, we are of the opinion that the trial court was fully warranted in concluding that Simmons remained a partner in the firm at all times from its original organization in 1903 until after the making of the note sued upon in this action. This being true, we need give no attention to the question of Simmons being estopped by reason of representations made to the bank. We have noticed what occurred at the bank at the time of the signing of the first note by Simmons for the firm, merely as an item of evidence bearing upon the question of whether or not he was a partner in fact without reference to the question of estoppel. The case of *National Grocery Co. v. Simmons,* 63 Wash. 264, 115 Pac. 306, is closely related to this case, and lends some support to our conclusions upon this branch of the case, though that decision was evidently influenced more by estoppel.

It is finally contended that the trial court erred in providing in the judgment that it should be "enforcible out of the separate and community property of D. W. Simmons." At the time of the forming of the partnership in 1903, and of his contributing $1,000 towards the capital thereof, Simmons was not married. He thereafter married Nellie E. Simmons in 1905. There is no language in the conclusions of law or judgment which could possibly be construed as establishing this judgment as an obligation against the community, other than that above quoted. It is not in terms a judgment against the community nor against Nellie E. Simmons. The argument of counsel for appellant proceeds upon the theory, however, that the judgment may be construed as being against the community. Counsel for respondent, while claiming that the judgment ought to have been in terms against the community, insists that:

"Appellant Nellie E. Simmons cannot complain of the judgment, because it is not a judgment against her or her

interest in the community property, although we believe that it should properly have been against the community and its property. She cannot complain because the judgment is enforcible out of the community personal property."

We agree with the position taken by counsel for respondent upon this question. It seems to us that this provision gives the judgment no more force than it would have without such provision.

We conclude that the judgment must be affirmed. It is so ordered.

DUNBAR, C. J., CROW, CHADWICK, and GOSE, JJ., concur.